# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RAPID TEST PRODUCTS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 2431 |
| | ) | |
| DURHAM SCHOOL SERVICES, a/k/a | ) | |
| ROBINSON BUS SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rapid Test Products (RTP) brought this action against defendant Durham School Services (Durham) alleging violation of 42 U.S.C. §1981, breach of contract, defamation, and promissory fraud, after it was not utilized as a subcontractor for the Chicago Public Schools (CPS). Durham filed a counterclaim in which it accuses RTP of fraud and unjust enrichment. Durham now moves for summary judgment on all counts of RTP's complaint, and also on its unjust enrichment counterclaim. RTP moves for summary judgment on Durham's fraud counterclaim. For the following reasons, Durham's motion for summary judgment is granted as to RTP's §1981 claim, and the remaining claims and counterclaims are dismissed without prejudice.

## BACKGROUND

The following factual background is taken from the parties' Rule 56 statements and accompanying exhibits. For the purposes of the cross motions for summary judgment the facts are viewed in the light most favorable to the respective non-movant. Gazarkiewicz v. Town of Kingsford Heights, 359 F.3d 933, 939 (7th Cir. 2004).

RTP is an Illinois corporation owned by Cynthia Cooper, and certified by the City of Chicago as a Minority Business Enterprise (MBE) and a Women Business Enterprise (WBE) in the speciality areas of "Database Administration for Drug Testing; Billing and Marketing Services" (Durham Ex. A), and by Cook County in the area of "Supplier of Rapid Test Products for the Detection of Drugs" (Durham Ex. B). Durham provides student transportation services (busing) to school districts throughout the United States and Canada.

In 2002, CPS solicited bids for busing services to be provided for a period of three years in various CPS districts. Bidders were required to submit affirmative action plans that complied with CPS' minority participation requirements. Rudy Thompson, who was then a regional manager for Durham and responsible for locating MBEs to participate on Durham contracts, contacted Cooper and asked her about RTP's certifications and services (Thompson dep. at 9). Thompson expected RTP to provide drug testing services for Durham's drivers, bus attendants and mechanics, and also provide billing services, even though he knew RTP's certification was for database administration (*id*. at 10-11). Thompson then instructed Cooper to submit a form known as the "Form 103A Letter of Intent," which MBEs complete and prime bidders attach to their bids. Form 103A seeks information about the MBE, including the services it intends on providing, the terms of payment and total dollar amount to be received for those services, and the percentage that dollar amount represents of the prime contract. Cooper submitted a Form 103A, but Thompson thought it was not "expansive enough," so he provided Cooper with a sample form showing her how to describe RTP's services. Cooper copied Thompson's description, and in a second Form 103A she stated that RTP would provide "drug testing of drivers, attendants mechanics, billing services." This form was included in Durham's bid, which was submitted to CPS on March 7, 2002. On May

22, 2002, CPS awarded the contract to Durham.

After Cooper signed the Form 103A, she met with Thompson at a Durham facility. At that meeting the parties discussed Durham's drug testing policies and procedures. Cooper agreed that the drug testing services were to be performed by a firm other than RTP (Cooper dep. at 141), such as Concentra, the firm that provided Durham with drug-testing services at the time the parties met (*id.* at 144). Cooper asserts that the she and Thompson agreed that RTP would provide the administration of the drug-testing program (*id.* at 146), but the parties failed to specify how she was to fulfill her obligations (*id.* at 147). Those details were to be discussed at another meeting, but no second meeting took place (*id.* at 147). Durham never used RTP for any drug testing or administrative services.

Sometime during the summer of 2002 Durham entered into a contract with Quest Diagnostics (Quest), whereby Quest provided drug-testing services for all of Durham's facilities across the country. On July 30, 2002, Cooper learned from Mike Rose, a Durham representative, that due to the Quest contract RTP's services might not be needed. Thompson still wanted RTP to participate on Durham's contract with CPS, and, based on the fact that Cooper received some training on how to take fingerprints, he invited Cooper to perform fingerprinting services for Durham (Thompson dep. at 18). Cooper agreed, and, following Thompson's directions, she submitted a $5,000 invoice to Durham, which Thompson subsequently paid (*id.*; Durham Ex. O). Thompson intended for Cooper to deposit the $5,000 into an account from which she would deduct costs related to fingerprinting services that she provided. Cooper submitted two additional invoices for fingerprinting services. Durham paid the first invoice, but not the second.

After her discussion with Rose, Cooper wrote to the CPS contract compliance office and

complained that Durham was not using RTP's services (Durham Ex. S, T). In a letter dated January 30, 2002, Rosalinda Castillo, from the CPS Office of Business Diversity, reminded Durham that it committed to use RTP for 2 per cent of the total contract amount, and honoring that commitment was a condition in its contract with CPS (Durham Ex. U). Soon after that letter, CPS and Durham met, and one week later Durham submitted a memo detailing its relationship with RTP. Durham, through its vice-president David Duke, stated that Thompson's actions were not authorized, and, also, that RTP's receipt of $5,000 appeared fraudulent (Durham Ex. W). On March 3, 2003, Durham provided CPS with a revised plan for MBE participation. RTP was not included in that revised plan and it subsequently brought this action against Durham.

In its motion for summary judgment Durham first argues that it never entered into a contract with RTP because the parties did not agree to any essential terms. In response, RTP argues that there was an agreement embodied by Form 103A, and, alternatively, that it is a third party beneficiary. Durham then contends that without a contract RTP cannot maintain its §1981 claim, and that even if a contract existed, there is no evidence of intentional discrimination by Durham. RTP ripostes that it has evidence that Durham harbored animus against African Americans. Next, Durham argues that there is no evidence of fraudulent intent on its part, or detrimental reliance by RTP that would support the promissory fraud claim. RTP argues that intent is a question of fact that cannot be decided on summary judgment. Durham also claims that no facts support the defamation claim because Duke's statements concerning RTP's receipt of $5,000 were conditionally privileged. RTP contends that Duke abused his privilege by failing to investigate the truth of his statements.

Turning to the counterclaim, Durham seeks summary judgment on Count I, in which

it claims that RTP must return the balance of the $5,000, which RTP believes it should keep because it was a retainer, and also that any amount that must be returned should offset any recovery it is entitled to receive. RTP seeks summary judgment on Durham's fraud counterclaim, and it concludes that there is no evidence Cooper intended to defraud, but Durham claims that there are outstanding material facts relating to Cooper's intent.

## DISCUSSION

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We do not make credibility determinations or weigh evidence when ruling on a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Our only task is to "decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. We will grant a summary judgment motion when the evidence in the record shows that no dispute exists or that the evidence brought by the nonmoving party is not sufficiently probative because it is only colorable as opposed to material. Id. at 249-50; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The analysis begins with RTP's §1981 claim, which provides the sole basis for federal jurisdiction, and, without that claim, the court lacks jurisdiction over the remaining state law claims. "Section 1981 prohibits discrimination on grounds of race in the making and enforcing of contracts." See Vakharia v. Swedish Covenant Hosp., 190 F.3d 799, 806 (7th Cir. 1999). The

term "make and enforce contracts" covers the periods prior to and after the formation of a contract. *See* section 1981(b).[1]  Cases often focus on "proof of a contractual relationship" as the basis for a section 1981 claim.  <u>Walker v. Abbott Labs.</u>, 340 F.3d 471, 475 (7th Cir. 2003); *see also* <u>Gonzalez v. Ingersoll Milling Mach. Co.</u>, 133 F.3d 1025, 1034 (7th Cir. 1997) ("By its terms, section 1981 governs contractual relationships . . . In order to bring a section 1981 claim there must at least be a contract.").  But section 1981 specifically covers the making of contracts, and an enforceable contract is not a condition precedent to a section 1981 claim. Evidencing this is that a party may not refuse to contract with another based on his race. *See, e.g.,* <u>Runyon v. McCrary</u>, 427 U.S. 160, 170-72 (1976); <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 176-77 (section 1981 "prohibits, when based on race, the refusal to enter into a contract with someone."), superseded by statute on other grounds; <u>Sanghvi v. St. Catherine's Hosp.</u>, 258 F.3d 570, 573 (7th Cir. 2001).  RTP does not allege that defendant discriminated against it in the formation of a contract.  Rather, it assumes the existence of a contract and claims that it was discriminated against in the performance of that contract.  Therefore, its claim depends on the existence of a contract, and the threshold issue is whether RTP and Durham entered into a contractual relationship.

On September 22, 2003, the court ruled on Durham's motion to dismiss RTP's complaint and held, in part, that RTP sufficiently alleged the existence of a contract.  <u>Cooper and Rapid Test Products v. Durham School Services</u>, 2003 U.S. Dist. LEXIS 25005; 2003 WL 22232833, *3-5 (N.D. Ill. 2003). The following factors supported that conclusion: RTP alleged that it negotiated and reached an agreement with Durham; RTP provided a letter of intent

---

[1]Section 1981(b) defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

affirming that it would provide drug-testing services to Durham employees; Durham included this letter of intent with its bid proposal to CPS; and Durham specified that RTP would receive 2 per cent of the contract's value in exchange for its drug-testing services. *See id.* at 4 ("Thus, RTP alleged the existence of a contract between RTP and Durham under which RTP would test employees for drugs and Durham would pay RTP $434,547.50."). The challenge here is to determine whether there is any factual substance that supports those allegations.

In the typical subcontractor/general contractor relationship a general contractor solicits bids for a specific project, and subcontractors submit bids, which function as offers. The general contractor's inclusion of a subcontractor's bid in its proposal for the prime contract does not in itself create a contract with the subcontractor, as the winning general contractor will subsequently send a subcontract to the subcontractor. *See* S.M. Wilson & Co. v. Prepakt Concrete Co., 23 Ill. App. 3d 137, 318 N.E.2d 722, 724 (Ill. App. 5th Dist. 1974). Illustrating the absence of a contract is the fact that when a subcontractor who submits a bid refuses to perform, the aggrieved general contractor's remedy rests on the doctrine of promissory estoppel, not breach of contract. *Id.*; Pickus Constr. & Equip. v. Am. Overhead Door, 326 Ill. App. 3d 518, 761 N.E.2d 356, 260 Ill. Dec. 512 (Ill. App. 2d Dist. 2001); Bogue v. Sizemore, 241 Ill. App. 3d 250, 608 N.E.2d 1246, 1249, 181 Ill. Dec. 772 (Ill. App. 4th Dist. 1993) ("The Illinois cases have given the general contractor protection by the doctrine of promissory estoppel.") (Cook, J., dissenting).

Here, the first element of a contract is missing because RTP never submitted an offer in the form of a bid. *See* Steinberg v. Chicago Med. Sch., 69 Ill.2d 320, 371 N.E.2d 634, 639, 13 Ill. Dec. 699 (Ill. 1977) (citations omitted) ("An offer, an acceptance, and consideration are basic ingredients of a contract."). But this case does not present the typical

subcontractor/general contractor relationship because CPS does not award contracts based on price, but rather on the degree of MBE participation. A bid that is 50 per cent less than the next lowest bid, but that also has no MBE participation, would be rejected by CPS as non-responsive to its MBE guidelines. Yet, even if an MBE's offer to provide services was tantamount to a subcontractor's bid, the record shows that the parties never agreed on the essential terms of the agreement.

Definite and certain terms are necessary for the formation of a valid contract. Zirp-Burnham, LLC, v. E. Terrell Assocs., 356 Ill. App. 3d 590, 826 N.E.2d 430, 439, 292 Ill. Dec. 289 (Ill. App. 1st Dist. 2005); Midland Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill.2d 306, 515 N.E.2d 61, 65, 113 Ill. Dec. 252 (Ill. 1987); Academy Chicago Publishers v. Cheever, 144 Ill.2d 24, 578 N.E.2d 981, 983, 161 Ill. Dec. 335 (1991); Morey v. Hoffman, 12 Ill.2d 125, 145 N.E.2d 644, 647 (Ill. 1957) ("To be enforceable the contract must be so definite and so certain in all of its terms that a court can require the specific thing contractor for to be done. The terms must be clear, certain and free from ambiguity and doubt.").

RTP and Durham never agreed on a number of essential terms, disagreed on basic obligations and duties, and consequently never formed a contract. Responding to Durham's Rule 56.1 statement of facts, RTP admits that "Cooper and Thompson never reached a specific agreement on how Rapid Test would participate in the contract" (RTP resp. to statement of facts ¶40). The parties never settled on how RTP was to conduct drug-testing of Durham employees, and they failed to specify how often RTP's services would be needed (id. at ¶46). Nor did they agree on who would decide when to conduct random testing (id. at ¶42), and who would inform Durham employees when testing was to occur and when it was completed (id. at ¶43). The parties never even discussed, much less agreed to, the rates RTP was to charge

for specific services (Cooper dep. at 301-02). It is true that these terms relate to actual drug-testing, which Cooper admitted was to be conducted by another firm (*id*. at 141), but they also involve the administration of drug testing, which Cooper believed RTP could do (RTP resp. to statement of facts ¶58; Durham Ex. M). Thus, the parties never agreed on how RTP was to administer the drug-testing program, and negotiations on that matter were incomplete. *See* RTP resp. to statement of facts ¶41 (parties never reached a specific agreement as to what RTP would do); ¶57 (RTP's responsibility was still being formulated); Cooper dep. at 294-98. *See* Academy Chicago Publishers v. 578 N.E.2d at 984 ("A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.").

RTP contends that Form 103A represents a binding commitment between the parties, but that document cannot, by its very terms, support an enforceable agreement. Instead of creating an agreement, Form 103A illustrates the absence of an agreement. Cooper, at Thompson's direction, indicated that RTP would perform drug-testing of drivers, attendants, and mechanics. But, as mentioned above, Cooper acknowledged that RTP would never perform actual drug-testing services, even though Thompson stated that he expected RTP to conduct actual drug tests (Thompson dep. at 11). Thompson's credibility on this point is weak, since he knew the scope of RTP's MBE certification did not extend to the actual drug-testing (*id*. at 10). If Thompson knew that RTP could never provide actual drug tests, it is impossible to portray Form 103A as a binding commitment between the parties because RTP could not fulfil its stated obligations. And the service that Cooper asserts RTP was willing and able to provide – database administration – is not mentioned in Form 103A. The form does mention

"billing services," which RTP was M/WBE certified to perform, but the parties never agreed what those billing services would be. A binding agreement cannot be based on a single ambiguous term.[2] *See* <u>Rose v. Mavrakis</u>, 343 Ill. App. 3d 1086, 799 N.E.2d 469, 473, 278 Ill. Dec. 751 (Ill. App. 1st Dist. 2003) ("in order for a contract to be capable of enforcement, its terms and provisions must enable the court to determine what the parties have agreed to do.").

Relying on the fact that CPS labels Form 103A a "Letter of Intent," RTP cites cases that discuss when a letter of intent may serve as a binding agreement. For example, a letter of intent is enforceable when it does not contemplate a future agreement as a condition precedent to a formal contract. <u>JamSports and Entertainment, LLC v. Paradama Productions, Inc.</u>, 336 F. Supp.2d 824, 846 (N.D. Ill. 2004). RTP states that neither it nor Durham contemplated a future agreement, but that contention is undermined by Cooper's repeated references to anticipated meetings with Thompson and Durham to fine-tune the details of the agreement. Yet there is an even more basic reason why RTP's argument that Form 103A is a binding letter of intent must fail. Form 103A may be labeled "letter of intent," but it is fundamentally different from the letters of intent discussed in the cases cited by the parties. Those letters of intent include specific details regarding the terms and conditions of the contemplated contractual relationships between the parties. <u>Interway, Inc. v. Alagna</u>, 85 Ill. App. 3d 1094, 407 N.E.2d 615, 618, 41 Ill. Dec. 117 (Ill. App. 1st Dist. 1980) (stating a letter of intent is "a document that embodies the essential terms of a contract, yet recites that a more formal agreement will be executed by the parties."). Form 103A is bare by comparison, presents no

---

[2]RTP also contends that "the one thing that was certain" was that it was to receive 2 per cent of the total contract's value. However, that sum was based on the representations of services to be provided in Form 103A, which, as discussed above, include services that RTP could not perform and services that were ambiguous and undefined.

essential terms of the purported agreement between RTP and Durham, and could not support any future agreement – a hallmark trait of enforceable letters of intent. *See* Frank Horton & Co. v. Cook Electric Co., 356 F.2d 485, 490 (7th Cir. 1966); Chicago Inv. Corp. v. Dollins, 107 Ill.2d 120, 481 N.E.2d 712, 715 89 Ill. Dec. 869 (Ill. 1985); Magnus v. Lutheran General Health Care Sys., 235 Ill. App. 3d 173, 601 N.E.2d 907, 913, 176 Ill. Dec. 209 (1st Dist. 1992).

Instead of serving as an agreement between Durham and RTP, Form 103A is an affidavit[3] submitted by Durham to CPS for the purpose of substantiating representations of M/WBE compliance made elsewhere in the bid proposal. Section 8.2 of the Board of Education's revised MBE remedial plan portrays Form 103A as the method for prime bidders to show they are committed to meeting the plan's goals (Durham Ex. Y). Thus, Form 103A is a condition of the agreement between CPS and Durham, and does not establish an agreement between RTP and Durham.

The experience of MedRx, the firm Durham used in place of RTP, further illustrates that Form 103A is not a contract. MedRx completed a Form 103A and, like RTP, it believed that it was to receive 2 per cent of the contract's total value. John Der, the owner of MedRx, testified that he believed Form 103A created a binding agreement between MedRx and Durham (Der dep. at 20, 71). However, during his deposition, Der learned for the first time that he was actually working for only 1.29 per cent of the contract's total value, indicating that despite Form 103A the parties never agreed on the terms of payment (Der dep. at 30-31).[4] *See* IMI Norgen, Inc. v. D&D Tooling Mfg., Inc., 306 F. Supp. 2d 796, 801-02 (N.D. Ill. 2004)

---

[3] The text above the signature lines on the form acknowledges that Form 103A is an affidavit that is distinct from the M/WBE Plan.

[4] This is not to say that no contract exists between MedRx and Durham, as we express no opinion on that matter.

("Under Illinois contract law, a binding agreement requires a meeting of the mind or mutual assent as to all material terms.").

Recognizing the possibility that no contract existed between it and Durham, RTP suggests that it was an intended third party beneficiary of the contract between CPS and Durham. However, the contract specifically forecloses that argument when it states: "This contract is intended for the exclusive benefit of the parties to this contract and their respective heirs, successors and assigns. Nothing contained in this contract shall be construed as creating any rights or benefits in or for any third party" (Durham Ex. C at 18). In Illinois, the contracting parties' intent to benefit a third party must be evidenced by an express provision, and, absent such a provision, courts will not presume third party beneficiary status exists. McCoy v. Ill. Int'l Port Dist., 334 Ill. App. 3d 462, 778 N.E.2d 705, 712, 268 Ill. Dec. 439 (Ill. App. 1st Dist. 2002); Ball Corp. v. Bohlin Building Corp., 187 Ill. App. 3d 175, 543 N.E.2d 106, 107, 134 Ill. Dec. 823 (Ill. App. 1st Dist. 1989). Third party beneficiary status does not exist when there is a specific provision indicating the parties contracted for their exclusive benefit. RTP ignores the express denial of third party beneficiary status and thus fails to present any arguments to suggest why the court should reject the plain language of the provision.

RTP has sought relief under a breach-of-contract theory, but there is no contract to enforce. This does not mean that there could not have been a contract. Under these circumstances, M/WBE vendors could easily protect their interests by entering into subcontracts with the prime bidders prior to or after the awarding of the prime contract. If those subcontracts are entered into before the prime contract is awarded, they may be made contingent upon the prime bidder's success. Entering into clear and definite contracts that spell out all essential terms will protect the interests of the M/WBE firms, and also the firms

that contract directly with CPS. And, in the absence of separate subcontracts, if the prime contractor does not fulfill its obligations with CPS, for example, by treating M/WBE firms as "pass-throughs," or mere third party administrators, the proper party to police the contract is CPS.

Without a contract, RTP's §1981 claim fails, and without that claim the court lacks jurisdiction over the remaining state law claims. Under 28 U.S.C. §1367(c)(3), the court may decline to exercise jurisdiction over those remaining claims, but it is also within our discretion to rule on those claims. When all federal claims are dismissed before trial, the general rule is that "the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." Wright v. Associated Insurance Cos., Inc., 29 F.3d 1244, 1250, 1251 (7th Cir. 1994). Judicial economy, fairness, convenience, and comity, are values that must be weighed when determining whether to stray from the general rule and exercise supplemental jurisdiction. City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997). This case was filed over two years ago and it has already been the subject of one written opinion, which weighs in favor of retention. If the dismissal of the federal law claim forecloses the disposition of the state law claims, supplemental jurisdiction should be exercised. *See* Burrell v. City of Mattoon, 378 F.3d 642, 651 (7th Cir. 2004). While the loss of the federal claim dooms RTP's state law breach-of-contract claim, not all of RTP's state law claims necessarily face a similar fate, which favors dismissal. If remaining state law claims raise issues that implicate unsettled state law, they should be resolved by state courts. Timm v. Mead Corp., 32 F.3d 273, 277 (7th Cir. 1994). Another factor favoring dismissal is that Illinois courts have recognized it is not precisely clear what constitutes a "scheme" – a necessary element of the promissory fraud claim. *See* Gen. Elec. Credit Auto Lease, Inc. v. Jankuski, 177 Ill. App. 3d

380, 532 N.E.2d 361, 364, 126 Ill. Dec. 676 (Ill. App. 1st Dist. 1988). It would benefit the parties to proceed under the assumption that no contract exists, so as to focus on the remaining state law claims, which predominated this case even prior to the dismissal of the §1981 claim. The remaining state law claims, including Durham's counterclaims, are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Durham's motion for summary judgment is granted as to RTP's §1981 claim, and the remaining claims and counterclaims are dismissed without prejudice.

JAMES B. MORAN
Senior Judge, U. S. District Court

Aug. 12, 2005.