IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAPID TEST PRODUCTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 03 C 2431 |
| | ) |
| DURHAM SCHOOL SERVICES, a/k/a | ) |
| ROBINSON BUS SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rapid Test Products, Inc. ("Rapid Test"), brought this action against defendant Durham School Services ("Durham") for violation of 42 U.S.C. § 1981, breach of contract, promissory fraud, and defamation. Durham moved for summary judgment on all counts. The court granted that motion, holding that no contract existed between Rapid Test and Durham, and that plaintiff's complaint did not allege discrimination in the formation of a contract. Rapid Test Products, Inc. v. Durham Sch. Serv's, 2005 U.S. Dist. LEXIS 17105 (N.D. Ill. Aug. 12, 2005). As such, there could be no violation of § 1981. We declined to exercise supplemental jurisdiction over plaintiff's remaining state law claims. Plaintiff appealed and the Seventh Circuit affirmed in part and reversed in part. 460 F.3d 859 (7th Cir. 2006). It affirmed our holding that no contract existed, but reversed summary judgment on plaintiff's § 1981 claim, holding that plaintiff did not need to specifically plead the legal theory of discrimination in the formation of a contract when the allegations in the complaint permit such an inference. The Seventh Circuit vacated the judgment and remanded the case to permit this court to consider plaintiff's § 1981 claim on this ground. We now grant defendant's renewed

motion for summary judgment.

## BACKGROUND

The parties supplemented their original briefs, and thus their original statements of facts and responses to those statements stand. The facts set forth are undisputed, unless otherwise noted.[1] Rapid Test Products, Inc. is an Illinois corporation whose sole shareholder, officer and employee is Cynthia Cooper, an African-American. Cooper prepared the company's promotional brochure, describing Rapid Test as a provider of a program featuring breath alcohol testing, urine drug screening, medical examinations and fingerprinting. Rapid Test is certified by the City of Chicago as a Woman Business Enterprise ("WBE") and as a Minority Business Enterprise ("MBE"), in the specialty area of "data base administration for drug testing; billing and marketing services," and by Cook County as a "supplier of Rapid Test Products for the detection of drugs" (def. mem. exhs. A and B). Before starting Rapid Test, Cooper worked at Acculab, a medical testing laboratory owned by her brother, where she received training in urine specimen collection and preparation, and bookkeeping functions. (Thompson stmt, 11/30/04, p.10). She was not trained to analyze urine samples, conduct breath alcohol or nicotine tests, or to perform medical examinations. Rapid Test was not certified as a M/WBE provider of drug testing services.

Durham is a provider of student transportation services to metropolitan school districts throughout the United States and Canada. It is not minority-owned.[2] In January 1999, Durham acquired Robinson Bus Services, Inc., a minority-owned Illinois corporation whose

---

[1] Where the facts are disputed, this court has cited to specific testimony and exhibits of record.

[2] The parties agree that Durham is not minority-owned. However, we note that in his deposition Chester Tindall mentioned that Durham's CEO and COO, John Elliot, is African-American (Tindall dep. p.126).

principal was African-American. Arthur Rudy Thompson, also an African-American, was originally employed by Robinson Bus Services, and after its acquisition by Durham he continued to work as its Chicago regional manager.

In early 2002, the Chicago Public Schools ("CPS") solicited bids for a three-year student transportation services contract, to commence in the fall of that year. The solicitation of bids required, among other things, that all qualified bidders submit a detailed description of the bidder's drug- and alcohol-testing program that met the U.S. Department of Transportation's requirements. It also required bidders to submit an affirmative action plan demonstrating compliance with applicable laws and with the school board's policy of equal opportunity employment. Only services for which a minority participant is certified could be credited toward the contracting vendor's compliance with the plan. Durham prepared and submitted a bid to CPS on March 22, 2002, which included its drug-testing policy and a list of several MBEs and one WBE as subcontractors. Rapid Test was included in Durham's proposal as an MBE at a participation level of 2%. Along with Durham's bid was a request for waiver, relating to M/WBE compliance goals. CPS awarded the contract to Durham on May 22, 2002.

Rapid Test's principal, Cooper, had learned of the CPS solicitation in early 2002. She contacted Thompson, who she knew through a mutual friend, and expressed interest in Rapid Test's participation as an MBE in Durham's anticipated bid. Thompson provided Rapid Test with a letter of intent, Form 103 A, which was prepared and used by CPS to identify M/WBE participants in contracts it awarded. Cooper asked Thompson for instructions in filling out the form and he told her to indicate "drug testing" as the service to be provided. Cooper executed the letter of intent on behalf of Rapid Test, describing the services as "drug testing

of drivers, attendants, mechanics, billing services" (def. exh. K). This letter, along with Rapid Test's MBE and WBE certifications, was submitted with Durham's bid.

At the time Cooper submitted the letter of intent, she never intended to actually perform drug- or alcohol-testing services. Cooper expected that Rapid Test would provide administration and monitoring of Durham's drug-testing program, and that the actual testing would be performed by another company. Durham, however, handled its drug-testing billing and administrative services internally, and did not need Rapid Test for that purpose. However, Rosalinda Castillo, former director of the business diversity office of CPS, testified that because of the diversity requirement, many times companies include minority and women businesses in their bids to perform services the company could itself perform (Castillo dep., 1/8/04, p.147).

After Cooper submitted the letter of intent, she arranged a meeting with Thompson. At that meeting she was given a copy of Durham's drug-testing policy and, Cooper testified at her deposition, copies of analyses from the company Durham was currently using for drug testing, Concentra. (Cooper 5/10/04 dep. at 144) Cooper testified that she believed Thompson asked her to "look at the possibility of another company providing the drug testing services because Concentra – [Thompson] had expressed displeasure with Concentra's pricing." (*Id.*). Thompson knew of Cooper's former employment and affiliation with Acculab. He stated[3] that because of that affiliation it was his understanding that she could handle the drug testing and he "expected Rapid Test to collect the specimens, fill out the paperwork and get it to the lab."

---

[3] The court is unsure why Thompson was never subjected to a deposition by the parties. However, on separate occasions each party took a sworn statement from Thompson composed of questions and answers (Thompson stmt.,1/30/04, def. exh. CC; Thompson stmt.,12/15/04, RTP exh. 3). Rapid Test's examination of Thompson occurred after Durham's, but according to Rapid Test it was not in possession of Durham's statement at the time its statement was taken. However, this court has read the entire first statement, and the portions of the second that Rapid Test chose to provide, and finds no inconsistencies in Thompson's position.

(Thompson stmt.,1/30/04, pp.10-11). However, Rapid Test could not directly participate in the chain of custody protocol for specimen collection.

In August 2002, Thompson was made aware that Durham had consolidated all of its drug testing into a national account with Quest Diagnostics. Thompson testified that he informed Cooper of this development and that the national contract would have a negative impact on MBE participation in the drug testing area of the plan (Thompson stmt., 11/30/04, p.14). Thompson intended to look into other areas where Rapid Test could provide services or commodities to Durham, including fingerprinting. Cooper had been informally trained by her fiancé, a former Cook County probation officer, to take fingerprints, but Rapid Test was not certified as a WBE or MBE provider of fingerprinting services. At the time, Thompson did not know whether fingerprinting performed by Rapid Test would be credited towards Durham's MBE compliance goals.

Rapid Test was then asked to perform some fingerprinting for Durham. On August 29, 2002, Cooper wrote a letter to a CPS contract compliance officer regarding a possible contract dispute with Durham, in which she stated that "Thompson (Durham) is delinquently[4] working to insure [sic] that I have work with this contract, therefore maintaining contract compliance" (def. mem. exh. S).

Thompson requested that Cooper submit an invoice to Durham in the amount of $5,000. He testified that this was intended for her to "set up the account" similar to what Durham was currently doing with another fingerprinting company, Sylvan,[5] where "upon

---

[4] In her deposition Cooper testified that this word should be "diligently," rather than "delinquently." (Cooper 6/14/04 dep., 6/14/04, p.323).

[5] Thompson testified that Sylvan was a Caucasian-owned, female-owned business. (Thompson stmt.,11/30/04, p.18).

processing of the fingerprinting services, the amount of the services, would be deducted from the $5,000." (Thompson stmt., 11/30/04, pp.18-19). Cooper submitted this invoice and Durham subsequently paid it. Rapid Test then performed some fingerprinting services in the fall of 2002, but despite its requests, was not asked to perform any other services. Thompson asked Cooper to submit documentation for the fingerprinting work that Rapid Test had actually done, and Rapid Test submitted an invoice, dated September 30, 2002, in the amount of $685.30. Durham paid this invoice. Rapid Test performed some additional fingerprinting services between October and December 2002, and submitted an invoice dated January 15, 2003, in the amount of $979.00 (def. mem. exh.P, p.4). Thompson had left his position at Durham in November 2002.[6] (Thompson stmt., 11/30/04, p.6). Durham did not pay this third invoice.

In a monitoring report submitted to CPS for September through November, 2002, Durham stated that it had paid Rapid Test $5,685.30 for drug testing. Sandra Moses-Potts, a CPS employee who works with goods and services, testified that these monitoring reports are used to gauge contractor compliance with CPS minority participation requirements (Moses-Potts dep., pp.12-13).

On January 8, 2003, Cooper sent another letter to CPS, stating that while she had "received from Durham approximately $5693.00 for fingerprinting services," she had "not been utilized" to "provide drug testing services," as outlined by Rapid Test's contract (def. mem. exh.T). Noting the discrepancy between the monitoring statement's classification of this money as for drug testing, and Cooper's statement that it was for fingerprinting, Castillo

---

[6] The parties agree that Thompson never told Cooper that Durham would not give Rapid Test work because she was African-American or a woman.

testified she requested the inspector general's office to investigate Cooper's complaint (Castillo dep., 10/7/04, p.13). She sought permission to forward the complaint to them, but received no response (Castillo dep.,11/8/04, pp.190-94).

On January 30, 2003, Castillo sent Durham a letter, stating in part:

> Your company committed to utilizing Rapid Test Products by 2% of the total contract amount. As a condition of being awarded a contract with Chicago Public Schools you are required to honor your commitments. It has been brought to our attention that [Rapid Test has] not been utilized. We were not notified of any problems existing between Durham and Rapid Test and your inability to utilize Rapid Test.

(Def. Mem. Exh. U)

On February 11, 2003, Durham had a meeting with CPS (def. mem. exh.W ). Also on that day Cooper had a telephone conversation with Karen Burgess of CPS regarding work performed by Rapid Test and payments received by Durham. Cooper was not asked about possible discrimination and she made no mention of it. After Durham's meeting with CPS, Durham responded to CPS by letter dated February 18, 2003, setting out a chronology of its relationship with Rapid Test and a summary of its investigation of that relationship (def. mem. exh. W).

On March 3, 2003, Durham submitted a revised plan for M/WBE participation, discontinuing Rapid Test as an MBE participant. Durham stated that its reasons for discontinuing relations with Rapid Test were that Rapid Test did not offer drug testing services, as stated in the letter of intent, and there were unresolved issues relating to the $5,000 payment.

Durham's president, David Duke, testified that Durham was directed by CPS to replace Rapid Test, and that it contacted an Asian-owned company, MedRx, to take Rapid Test's

place. According to John Der, president of MedRx, the company is licensed by the State of Illinois to distribute pharmaceuticals (Der dep. at 108-9). It also had a contract with Quest Diagnostics, the laboratory with which Durham had a national contract for drug testing (*id.* at 102). MedRx is certified by the City of Chicago as an MBE, and its specialty is listed as "Medical Supplies, Drug Distribution and Drug Testing Services." Substitution of vendors is permitted under the CPS plan, subject to certain requirements, including written request for approval based on acceptable reasons justifying the substitution and approval by CPS. Castillo testified that after Durham submitted this corrective action plan, which was reviewed and discussed, CPS released payments previously withheld under the contract (Castillo 11/8/04 dep., pp.226-27). Castillo testified that no adverse action was taken against either Durham or Rapid Test resulting from their dispute (*id.*, pp.227-28; 201-202).

On March 24, 2003, Durham prepared a letter to Rapid Test, demanding the return of the $5,000 payment, less the $979.00 outstanding from the January invoice. The letter, sent certified mail, was returned unclaimed. This suit ensued.

## DISCUSSION

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We draw all inferences and view all admissible evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). This does not mean there exists no evidence supporting the non-moving party, but rather that evidence is not enough to support a reasonable jury verdict (*id.*, p.248).

"Section 1981 prohibits discrimination on grounds of race in the making and enforcing of contracts." Vakharia v. Swedish Covenant Hosp., 190 F.3d 788, 806 (7th Cir. 1999). The

existence of a contract is not a condition precedent to a § 1981 claim. *See* Sanghvi v. St. Catherine's Hosp., 258 F.3d 570, 573 (7th Cir. 2001). Rapid Test may prove discrimination under § 1981 either through direct evidence or through the indirect burden-shifting method discussed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 829 (7th Cir. 2007). "Under the direct method, the plaintiff must show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as her race or national origin." Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 938-939 (7th Cir. 2003). An example of direct evidence would be an employer's admission that an adverse employment action was taken against an employee based solely on an impermissible ground, such as race. Dandy v. UPS, 388 F.3d 263, 272 (7th Cir. 2004). Circumstantial evidence, on the other hand, may come in the form of "suspicious timing, ambiguous statements oral or written, [or] behavior toward or comments directed at other employees in the protected group...." *Id.* Circumstantial evidence "must point directly to a discriminatory reason for the employer's action." Adams, 324 F.3d at 939.

Rapid Test argues that it possesses direct evidence in the form of statements made to Cooper by an unidentified African-American man – purported to be a Durham employee – that "[t]hey treat you like niggers here." (plf. mem. p.8). Aside from the evidentiary issues of foundation and hearsay, this statement is not sufficient to be considered direct evidence of discrimination. "Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decision-maker, or those who influence the decision-maker, and made close in time to the adverse employment decision." Dandy, at 272. There is no evidence that this man

was a representative of Durham in any capacity, let alone one who influenced Durham's decision to cease working with Rapid Test.

Rapid Test also offers circumstantial evidence in the form of Durham's conduct towards other African-American-controlled subcontractors and its conduct towards Robinson Bus Company, an African-American-controlled company that Durham acquired. Rapid Test points to the fact that Durham fired Rudy Thompson, an African-American manager who had come to Durham through the Robinson acquisition. However, according to a document Durham submitted to CPS, Thompson resigned during an investigation into the misappropriation of funds (def. exh. W). Rapid Test offers no evidence to dispute this explanation, and therefore this does not constitute direct evidence of discrimination.

Rapid Test points to testimony of Rosalinda Castillo, former director of the office of business diversity for CPS, that out of numerous contracted bus companies, Durham alone had difficulty fulfilling its M/WBE commitments. But Castillo also testified that many companies fell short of CPS goal of 50% MBE and 5% WBE participation generally.

Rapid Test further argues that Durham counted its rent payments to its landlord against its M/WBE requirements – payments it falsely certified as being for "building management." If this fact is true, it could demonstrate that Durham was attempting to satisfy its M/WBE requirements without having to employ more MBE/WBEs. While such behavior might be inappropriate under the CPS guidelines, standing alone it does not "point[] directly to a discriminatory reason for the employer's action." Adams, 324 F.3d at 939. Regardless, Chester Tindall, the general manager for the Bureau of Student Transportation at CPS, was aware that Durham was using its landlord to fulfill a portion of its compliance (Tindall 10/6/04 dep. p.123), and therefore Durham was not doing anything inappropriate.

In the absence of direct evidence, Rapid Test may survive summary judgment through the indirect burden-shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that method it must first establish a *prima facie* case of discrimination by producing evidence that would allow a jury to find that (1) Rapid Test belongs to a protected class; (2) it met Durham's legitimate expectations; (3) it suffered an adverse employment action; and (4) similarly-situated non-protected individuals were treated more favorably. Elkhatib, 493 F.3d at 830. If Rapid Test establishes a *prima facie* case, the burden shifts to Durham to offer a legitimate reason for its actions. If Durham articulates such a reason, the burden shifts back to Rapid Test to offer sufficient evidence to allow a reasonable jury to find that Durham's reason is merely a pretext for discrimination. Both parties agree that Rapid Test meets the first and third elements of the *prima facie* case. They disagree about the second and fourth elements.

Durham argues that there is no genuine issue of material fact that Rapid Test did not meet its employment expectations. There is a question as to whether the measure of those expectations is based on the work Rapid Test was initially asked to do, or the work it actually performed. However, in both cases, we agree with Durham that no reasonable jury could find that Rapid Test met either set of expectations. With regard to drug testing, Rapid Test concedes it was not certified to do that work, nor was it licensed to collect specimens or participate in a chain of custody – tasks necessary to facilitate drug-testing.

With regard to the fingerprinting work, Durham argues that there were problems with Rapid Test's turnaround time – that some prints needed to be redone and often no one was available when contacted during business hours. Rapid Test argues that these "problems" were only pretext, created after the fact in a February 5, 2003, memo from Darnell Robertson,

the Field Safety Supervisor of Durham to Bob Foxley, the regional manager who replaced Thompson. However, in an email from Cooper to Thompson on September 20, 2002, (referenced in Cooper's deposition, but not found in the record), she acknowledged that Darnell Robertson was having issues with her turnaround time, and with contacting the State of Illinois regarding her license to fingerprint. (Cooper dep. p. 318). This was long before the February 5 memo, and long before Durham sought to dismiss Rapid Test. Rapid Test also argues that the problems with fingerprinting delays were historic, and did not rest solely with Rapid Test. Thompson's testimony supports this (Thompson 12/15/04 stmt. at 27). However, the delay in fingerprinting was not Robertson's only concern, but also the fact that a representative from Rapid Test was often not available, and several fingerprints needed to be redone. Rapid Test offers nothing to rebut these statements.

Durham also cites the issue with the $5000 that Rapid Test received as an advance on fingerprinting. The parties disagree as to whether that check was authorized by Durham or not, but what is not in dispute is that even if authorized, Rapid Test then invoiced and received a check for an additional $693.30 for fingerprinting services, which it cashed and kept. Even if the $5000 was an authorized "deposit for fingerprinting" (def. exh. O), that means Rapid Test was not entitled to keep the additional $693.30 that it received and it should have returned the money. Cooper, in her deposition, concedes that she was not entitled to the money (Cooper 6/14/04 dep. p.163). The fact that Rapid Test never returned the money is reason enough to find that it did not meet Durham's legitimate business expectations, because Durham expected any company it worked with to accurately bill and receive payment, and return any overpayments made. Therefore, Rapid Test has raised no genuine issue of material

fact that it met Durham's expectations either for drug-testing or for fingerprinting.[7]

Durham also argues that Rapid Test cannot demonstrate that any similarly-situated person who was not African-American was treated more favorably. There is no "magic formula for determining whether someone is similarly situated." Humphries v. CBOCS West, Inc., 474 F.3d 387, 405 (7th Cir. 2007). "Instead, courts should apply a common sense factual inquiry – essentially, are there enough common features between the individuals to allow a meaningful comparison." Id.

Durham argues that Rapid Test is not similarly situated to MedRx because MedRx is certified to participate in actual drug testing – collecting samples and participating in the chain of custody – as well as perform physicals. However, that is not what MedRx is actually doing for Durham. It does not handle any samples or physicals for Durham. It merely acts as a third-party administrator between Durham and Quest, something Rapid Test was qualified, certified, and willing to do. In that respect, both are similarly situated. However, unlike Rapid Test, Durham does not have any issues with the quality of MedRx's work, has no billing discrepancy with MedRx, and is not engaged in litigation with MedRx, all things that, at the

---

[7] Rapid Test argues that the expectations its performance should be measured against are those of its certification – "database administration for drug testing; billing and marketing services" (def. exh. A). Rapid Test argues that it was ready and qualified to perform that work, and therefore capable of meeting Durham's expectations. That it was never asked to do that work is evidence of Durham's discrimination. However, from a review of the record it appears that the only entity believing Rapid Test was brought in to do administrative work was Rapid Test itself. Rapid Test's letter of intent stated that it would be involved in drug-testing of drivers as well as billing services. When Durham was awarded the CPS contract it listed Rapid Test's participation as drug-testing. Even Thompson, the person closest to the situation and with the most knowledge of the details, stated that his understanding was that Rapid Test was going to handle the drug-testing and certification of drivers (Thompson 11/30/04 stmt. p.10; Thompson 12/15/04 stmt. pp.14-15). He expected it to collect specimens and send them to the lab, not just maintain records (Thompson 11/30/04 stmt. pp.11, 25). However, Mike Rose objected to Rapid Test doing the drug-testing and wanted to continue with Concentra. (Id. at 21; Thompson 12/15/04 stmt. p.14). When Thompson found that Durham was changing to a national contract with Quest for drug-testing, he attempted to retain Rapid Test on the contract by encouraging it to diversify and obtain certification in other areas (Id. pp. 14-15; Thompson 11/30/04 stmt. pp. 11-15). Thus, even Thompson, the person in charge of MBE compliance, did not believe that Rapid Test was going to be used for database administration – that at most it would be performing billing services – what MedRx does now – in addition to drug-testing.

time, formed the basis of Durham's request to discontinue using Rapid Test (def. exhs. W, X; RTP exhs. 107, 108). Because Rapid Test concedes that these issues, justified or not, did exist at the time Durham sought to discontinue the relationship, a reasonable jury could not conclude that it was similarly situated to MedRx. Since Rapid Test cannot satisfy two of the four requirements for a *prima facie* case, summary judgment is appropriate.

Even if plaintiff could establish a *prima facie* case of discrimination, Durham has offered legitimate business reasons for its decision not to use Rapid Test, and Rapid Test has not offered any evidence that could allow a jury to conclude that those reasons are pretext. Pretext means "a dishonest explanation, a lie rather than an oddity or an error." Grube v. Lau Industries, Inc., 257 F.3d 723, 729 (7th Cir. 2001)(quoting Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000)). Courts are to "bear in mind that the overall correctness or desirability of the reasons proffered is not relevant," and that to establish pretext a plaintiff must establish that the proffered reasons (1) are factually baseless; 2) were not the actual motivation for the decision; or 3) were insufficient to motivate the decision. *Id.* (quoting Baron v. Highland Park, 195 F.3d 333, 341 (7th Cir. 1999)). So long as the employer honestly believes its proffered reasons, pretext has not been shown. Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000).

Contrary to plaintiff's arguments, Durham has been consistent in its proffered reasons for discharging Rapid Test. Rapid Test was not certified to do what it claimed in its letter of intent that it could do, and Durham had no need for the services Rapid Test was actually certified to perform. Rapid Test points to the fact that Durham then engaged MedRx for the same work that Rapid Test asked to perform. However, the uncontradicted testimony and e.mails exchanged between Durham officials demonstrate that Durham did not wish to replace

Rapid Test at all, given that the work was already being performed by Durham itself (RTP exh. 53; Duke 7/28/04 dep., pp, 38,39). Only when pressed by CPS to add another vendor in order to comply with its MBE requirement, did Durham then re-investigate the situation, finding that the only other vendor, besides Rapid Test, certified to participate, was MedRx (Duke 7/28/04 dep., pp. 131-32, 137).

Even if plaintiff could demonstrate that this reason is pretext – "where multiple reasons are given, the employee must demonstrate that each reason is pretextual." Wilson v. AM General Corp., 167 F.3d 1114, 1120 (7th Cir. 1998). Plaintiff has failed to produce any evidence that Durham's other reasons are pretextual, and it therefore cannot survive summary judgment. For example, Durham notes that Rapid Test accepted and retained a $5,000 deposit for which no work was done. Even if that $5,000 was properly invoiced and received as a deposit for fingerprinting, Rapid Test's accepting (instead of returning) of an additional $693.30 for fingerprinting services (which should have been charged against the deposit), is a sufficient and legitimate reason for Durham to not want to work with Rapid Test any longer. Rapid Test has offered no evidence to demonstrate that this reason is pretext.

Durham also cites the fact that Rapid Test had engaged Durham in litigation. Rapid Test concedes this, but states that the litigation was premised upon Rapid Test's underutilization by Durham, and remedial measures by Durham would have ended the litigation. This does not change the fact that a business may not feel comfortable working with a party who is suing it, regardless of what steps might be taken to end that suit. This is a legitimate reason for discontinuing the use of Rapid Test, and plaintiff has offered no evidence to demonstrate it is merely pretext.

Since plaintiff has failed to offer sufficient evidence to raise a question of material fact

as to its *prima facie* case or pretext, Durham is entitled to judgment as a matter of law. Because our grant of judgment dismisses the only claim over which this court has original jurisdiction, we decline to exercise supplemental jurisdiction over plaintiff's state law claims. 28 U.S.C. § 1367(c).

We pause to note that, aside from failing the requirements of both the direct and the indirect method of proof, plaintiff has failed to offer any meaningful evidence of racial or gender discrimination in any form. This court has scoured the record in search of anything that could imply discriminatory animus in this transaction, and has found nothing. At best, what occurred here was the result of an over-zealous regional manager (Thompson) attempting to increase MBE compliance numbers by adding businesses that were either not certified in the areas needed or not needed in the percentages that the bid reflected.[8] According to Castillo, CPS was understaffed to analyze these bids with particularity, and thus the inconsistencies were not addressed until problems arose (Castillo 10/7/04 dep. at 74, 238-40, 285). This, and not discrimination, seems to be what led to a complete overhaul of Durham's MBE compliance plan more than a year into the contract (def. exh. X; RTP exh. 85, 107, 108). This, along with a misunderstanding and a lack of communication among Thompson, Cooper, and higher officials at Durham, is what ultimately led to Rapid Test's dismissal from the program. Not one person, besides Cynthia Cooper herself, makes any statement that could be inferred to relate to racial or gender discrimination in this case. No evidence, not even Durham's difficulty complying with the MBE program in general, could infer such

---

[8] For example, even if Rapid Test had remained as an MBE for Durham at 2%, that dollar amount, $334,547.50, was well beyond all the work that Rapid Test could have performed during the life of the contract given that Durham had only 150 bus lines and, at most, 200 drivers needing tests per year, assuming a cost of $45 per test (RTP exh. 62). Castillo testified that a similar situation had arisen with another Durham vendor, K.I. Morgan (Castillo 11/8/04 dep at 91).

discrimination on this record. What happened to Rapid Test appears to be an unfortunate misunderstanding between the parties, but such misunderstandings are not what § 1981 was intended to remedy.

## CONCLUSION

For the foregoing reasons, summary judgment is granted as to Count III, and we decline to exercise supplemental jurisdiction over plaintiff's state law claims.

JAMES B. MORAN
Senior Judge, U. S. District Court

June 13, 2008.